W. H. HERSTER ET AL. v. A. J. HERSTER ET AL.

ERROR TO THE COURT OF COMMON PLEAS OF NORTHAMPTON
COUNTY.

Argued March 8, 1887—Decided October 3, 1887.

1. On the trial of an issue *devisavit vel non*, the trial judge is justified in directing a verdict in favor of the proponent—not when he may feel that if he were sitting as a juror he would regard the evidence as insufficient to induce him to find a verdict against the alleged will—but when, after a careful review of all the testimony, he would feel that if a verdict were rendered in favor of the proponents after a fair and impartial trial, he would be constrained to set it aside as contrary to the manifest weight of the evidence.

2. When, the principal devisee and the testator dwelling together, a confidential relation exists between them, so that undue influence secretly exercised is especially possible, direct and positive evidence thereof is not essentially necessary; but, whether direct or circumstantial, the evidence must be of a satisfactory and convincing character.

3. Declarations of the testator made after the execution of the will, but tending to show the relations between the testator and the principal devisee and the power of the latter over the former, and indicating that undue influence or improper control of the free agency of the testator had been exercised, are admissible.

Before MERCUR, C. J., PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.; GORDON, J., absent.

No. 107 July Term 1886, Sup. Ct.; court below, No. 92 February Term 1885, C. P.

In proceedings in the Orphans' Court of Northampton county relating to the probate of the alleged will, with the codicils thereto, of Andrew Herster, deceased, on January 3, 1885, it was ordered: That an issue be awarded to be tried in due course of law to determine the questions of fact, whether the alleged will of June 13, 1874, and the codicils thereto of August 29, 1878, and of May 7, 1880, or only the said codicils, or one of them, were made and executed by Andrew Herster by reason of undue influence, fraud or misrepresentation; that in said issue, William Henry Herster and Irwin Reich and Eliza Reich, his wife, in right of the said Eliza, are to be

plaintiffs, and Andrew J. Herster, devisee, and Andrew J. Herster and James W. Lynn, executors, etc., are to be defendants. The issue as directed was duly formed by the proper pleadings in the Common Pleas and came on for trial on May 21, 1886.

Andrew Herster, the decedent, died on May 27, 1882, aged nearly 84 years, and leaving an estate worth from $200,000 to $250,000, a large portion being valuable real estate in Easton. He left six children, four sons and two daughters, and a grandchild, the daughter of a deceased son. By the will the greater part of the testator's property was bequeathed and devised to Andrew J. Herster, who was also the residuary legatee and devisee, and various bequests and devises were made to other children. By the two codicils several of the bequests and devises to the other children were revoked or changed, so that almost the entire estate passed to Andrew J. Herster, and the other children were " virtually disinherited."

To support the theory of undue influence exercised by the defendants in the issue, evidence was adduced: That the testator's wife had died about 1863, and thereafter until his death he was an inmate of the family of his son, Andrew Jackson Herster; that, though he had been a man of vigorous intellect and excellent business capacity, about 1872 he began to fail mentally and physically; that he had suffered for a number of years from frequent attacks of cerebral congestion, and in 1874, the year the will was executed, he had ten attacks, the most serious of which was but a few days before the execution of the will, when " he could not articulate well; he would not express himself intelligently; there was a loss of memory and he complained that his mind was failing him "; and that while in this condition he had been taken to the office of Mr. James W. Lynn, where the will was executed; that during this period, from the time of the first attacks of congestion of the brain until near the time of his death, he made statements to various witnesses, not members of his family, as to the misconduct of his children, indicating that he had become embittered against them; that on several occasions he had declared that his son Daniel and his wife had attempted to poison him, and had accused his children of stealing linen, clothes and money from the house, and directed the doors to be secured

by bolts and ropes; that testator declared on several occasions that these things were so, because he had been told so by his son Jack and also by Jack's wife; and that these complaints, charges and statements were without foundation; that within a week after the testator died, Mr. Lynn entered of record assignments of mortgages by the testator to Andrew Jackson Herster aggregating in amount $10,000, all of which had been executed within ten years, and also deeds for properties valued at $30,000; which instruments were all in the possession of the decedent up to the time of his death.

Andrew Jackson Herster, on the stand: Plaintiffs propose to ask this witness, called as on cross-examination, where this amount of $2,665 [in the bank-book of witness] came from; this to be followed by proof that he had no other means or resources from which to receive so large an amount, except through his father. Objected to as incompetent and irrelevant, and as an interference with the private matters of the witness that have no relevancy to the issue. Objection sustained; exception.[6]

Jacob Herster recalled by the plaintiff.

Plaintiff now offers to prove by this witness that on the Saturday before the testator's death, the decedent having died on the following Monday, and having become unconscious on Saturday preceding, that in an interview with the witness, the decedent expressed a great desire and anxiety to have possession of his will and the two codicils and that he requested the witness to remain with him during the day for the purpose of enabling him, in case the will and codicils were not returned to him, to procure them from the custody of James W. Lynn; that he declared to the witness repeatedly during the day that he had requested James W. Lynn, his attorney, who had prepared the will and codicils, to return them, and that he had sent his son, Andrew Jackson Herster, to the office of Mr. Lynn with instructions to bring the will and codicils to him; that on different occasions he had so sent him and that he would return and inform him that Mr. Lynn would bring them out himself, and when Mr. Lynn called he failed to bring them and made some excuse with reference to his not bringing them, either that he had forgotten them or some other reason for his failure to do so; that he declared to the witness

that he must see these papers before he died, and requested the witness to remain until late that evening in order to see whether the papers would be returned; that having waited at the testator's request until ten o'clock on that Saturday evening he stated to the witness that he should return on Monday morning following, and that if the papers were not brought to him he would make arrangements to send for or procure them from the custody of Mr. Lynn, and again told the witness that if they were not brought by Monday morning he should be sure to get them from the custody of James W. Lynn, and that he then declared that he must see those papers before he died and must have them; that on the Sunday following he had a stroke of apoplexy which rendered him unconscious for some time, and that on the following Monday morning, while upon his death bed, the testator being restored somewhat to consciousness, called his son Jacob to his bed and took his hand and declared repeatedly to him, " My God, it is all wrong, it is all wrong—My Got, es is letz, es is letz,"—and shortly after died: this evidence is offered in connection with the other circumstances already given in evidence for the purpose, 1, of illustrating and showing the state of the feeling of the testator towards his son Jacob and the remainder of the family; 2, to show undue influence, and that the testator was in a condition easily to be influenced; 3, for the purpose of showing the testator's state of mind as to its weakness and impressibility; 4, for the purpose of showing that when removed from the presence of Andrew Jackson Herster or of the wife of Andrew Jackson Herster, that there was a state of mind indicating a feeling of dissatisfaction with what had been done with reference to his will and two codicils; this evidence to be followed also by proof that repeatedly, from a time beginning with five or six years prior to the decedent's death and at different times up to the time of his death, the testator complained of the failure of Lynn and Andrew Jackson Herster to bring or to give him the custody and possession of the will and codicils, and in connection with proof that upon these different occasions the testator repeatedly declared his anxiety to have the custody and control of the will and codicils, and that the testator was dissatisfied with the state and condition of the disposition of his property in the will and codicils; offered

also in connection with the proof already in the case of simi-
lar declarations by the testator made a number of years
previously.

Objected to: Because the offer relates to proof of dec-
larations of the testator eight years after the execution of
the will and two years after the execution of the last codicil,
the same being incompetent under the pleadings to prove un-
due influence at or about the time of the execution of · either
the will or its codicils, and that the same has a tendency to
prove only an unexecuted purpose of revocation which is void
under the act of assembly; that the declarations themselves
are evidence only of a parol revocation eight years after the
execution of the will and two years after the execution of
the last codicil, which is void under the act of assembly and
because incompetent and irrelevant.

By the court: Under the authority in 109 Mass.—If the
sole purpose was to show the state of feeling between the tes-
tator and Jacob Herster, his son, I would feel constrained,
under the authority of that case to admit the evidence. But
I do not think the evidence included in the offer is of a char-
acter to illustrate especially, or at all, the state of feeling of
the testator towards his son Jacob. The offer is for a differ-
ent purpose. As I assume from the offer itself, it is for the
purpose of showing that undue influence had been exercised
upon the testator. I will admit evidence as to what took
place between the old man and Jacob that will illustrate the
nature of the feeling between the old man and Jacob upon his
death bed, but I don't think that the declarations by the old
man, that it all was wrong, would illustrate his feelings
towards Jacob or his other children. So far as the offer is
concerned I will sustain the objection and seal a bill for the
plaintiff. I will not admit the offer in the present form.

Plaintiff now renews the offer for the purpose of illustrating
the state of feeling of Andrew Herster, the testator, towards
his son Jacob.

By the court: You will have to eliminate from the offer,
before I can admit it, all that is not germane to the simple
question as to the state of feeling of the testator towards his
son Jacob—eliminate from the offer everything that is not
referable to the question of feeling. I sustain the objection
to the first offer. Plaintiff excepts.[8]

Statement of Facts.

Plaintiff now offers to prove that on the Saturday preceding the death of the testator, he requested his son Jacob to remain with him from about the middle of the day until late in the evening, and that he expressed to the witness his desire to procure his will and codicils; that in the absence of his son Andrew Jackson Herster, the testator treated his son Jacob in an affectionate and confidential manner; that his manner towards his son Jacob during the day was kindly and affectionate, and that on the following Monday, when stricken down upon his last bed of sickness, and shortly before his death, in his last moments of consciousness he took his son Jacob by the hand, affectionately calling him to his bedside and in a tone of sorrow and regret declared, " It is all wrong, My Got es is letz : " using the German language, and shortly after became unconscious and died.

By the court :  If you will strike out of that offer the latter part of it :  " My God it is all wrong," and strike out the part of it as to the request to Jacob to get the will and codicils, I will admit the offer, but the offer in its present shape we will have to exclude under the objection.  Plaintiff excepts.[9]

Plaintiff now proposes to prove that on the Saturday preceding the death of the testator, in the absence of his son Andrew Jackson Herster, the testator treated his son Jacob in an affectionate and confidential manner; that his manner towards his son Jacob during the day was kindly and affectionate, and that on the following Monday, when stricken down upon his last bed of sickness and shortly before his death in his last moments of consciousness he took his son Jacob by the hand, affectionately calling him to his bedside.  Objected to : as being incompetent and irrelevant and because it in no way illustrates the question of undue influence exercised eight years before his death, the time of the execution of the will, or two years before the time of the execution of the last codicil, the question of undue influence being the only question trying under the pleadings in this case.

By the court :  I was carried away temporarily by the. decision in 109 Mass.  There seems to be a conflict between the practice in Massachusetts and this state.  I therefore sustain the objection and give the plaintiff a bill.[10]

Plaintiff rests.

The court, W. W. Schuyler, P. J., charged the jury as follows:

This is an issue to try the validity of three papers purporting to be respectively the last will and testament and the codicils thereto of the late Andrew Herster, deceased. Mr. Herster died May 27, 1882, leaving behind him a large estate in farms, houses, and lots, personal property and money, estimated to be worth $200 000. He also left to survive him four sons and two daughters, all of whom at the time of their father's death were well advanced in years, having families of their own. So far as the evidence discloses, these children, with perhaps one exception, were respectable and well behaved members of the community in which they lived, and still are such. By his will and codicils Mr. Herster, instead of dividing his estate equally among his children, gives almost the entire bulk of it to one of his sons, Andrew Jackson Herster; the portions given to the other children, with the exception of Henry, amounting to scarcely more than a pittance. There is something in human nature that rebels against this species of favoritism, and no doubt when the will and the codicils were read in your presence you experienced as I did, a feeling not unlike indignation. The children thus virtually disinherited were as near to the testator as their more fortunate brother. They, like him, were bone of his bone, and flesh of his flesh, and they were all alike the natural objects of his bounty.

But whilst the law is in this way, gross inequality in wills has always been a fruitful source of litigation, and where the stake is as large as in the present case, it is not at all strange that the validity of the will should be challenged. Accordingly we find that two out of four of the less fortunate of Mr. Herster's children that survive, one of the five being dead, are here contending that the three papers purporting to be the last will and codicils of Mr. Herster are not what they purport to be. Of course, Jackson Herster, who, in addition to receiving the bulk of the estate, is appointed one of the executors of the will, denies this. James W. Lynn, Esq., Jackson's co-executor, also denies it. To be more specific, William Henry Herster and Eliza Reich, the two children just referred to as contestants against the will and codicils, and who are the plaintiffs here, affirm that the alleged will and codicils, or one of them,

were made and executed by reason of undue influence, fraud or misrepresentation. Jackson Herster and Mr. Lynn, the defendants here, deny this, and in this way is raised the issue now being tried. In more simple form, the issue is whether the will and codicils in controversy were procured to be made by undue influence; the terms fraud and misrepresentation as here used, signifying merely the means by which the alleged undue influence was acquired and exercised, for undue influence may be either through threats or fraud: Thompson v. Kyner, 65 Penn. St. 379. Now, undue influence is defined to be "any improper or wrongful constraint, machination or urgency of persuasion, whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely:" Abbott's Law Dictionary. "That is undue influence," says STRONG, J., in Eckert v. Flowry, 43 Penn. St. 51, "which amounts to constraint, which substitutes the will of another for that of the testator. It may be either through threats or fraud, but however exercised it must, in order to avoid a will, destroy the free agency of the testatrix at the time when the instrument is made. . . . . . Unless, therefore, there was some evidence tending legitimately to prove that fraud had been practiced upon the testatrix at the time, or that some misrepresentation had been made, or that some moral or physical coercion had been employed, such as to destroy her free agency, the court erred in submitting to the jury the question whether undue influence had been exerted. . . . . . Undoubtedly if the mind of the testratrix was weak it required less influence to control her will than it would have required to control the will of one whose mind was in full vigor. But neither moral or physical constraint is to be inferred from mental weakness alone. That undue influence, which suffices to destroy an alleged will, is distinct from weakness, and has no necessary connection with it."

But though there is no necessary connection between undue influence and weakness of mind they are usually found hand in hand, and hence it is always competent to inquire into the state of mind of the person alleged to have been influenced.

Says Mr. Justice PAXSON, in Cauffman v. Long, 82 Penn. St. 77, "no right of the citizen is more valued than the power

Charge of Court below.

to dispose of his property by will. No right is more solemnly assured to him by law. Nor does it depend in any sense upon the judicious exercise of it. It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. In many instances his testamentary disposition of property seems harsh, if not unjust; the result, perhaps, of prejudice, as to some of the testator's kindred, or undue partiality as to the others. But these are matters about which we have no concern. The law wisely secures equity of distribution where a man dies intestate. But the very object of a will is to produce inequality, and to provide for the wants of the testator's family, to protect those who are helpless, to reward those who have been affectionate, and to punish those who have been disobedient. It is doubtless true that narrow prejudice sometimes interferes with the wisdom of such arrangements. This is due to the imperfections of human nature. It must be remembered that in this country a man's prejudices are a part of his liberty. He has a right to them; he may be unjust to his children or relatives. He is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law. Where a man has sufficient memory and understanding to make a will, and such instrument is not the result of undue influence, but is the uncontrolled act of his own mind, it is not to be set aside in Pennsylvania without sufficient evidence nor upon any sentimental notions of equality."

To establish the charge of undue influence two points must be sustained : First, the fact that the influence was exercised, and next that it was effectual in producing the alleged result. Under the last branch it is competent " to show that the testator was of that peculiar mental structure, was possessed of those intrinsic or accidental qualities, was subject to such passion or prejudice, of such perverse or feeble will, or so mentally infirm in any respect as to render it probable that the efforts used were successful in producing in the will offered the combined result. The purpose of the evidence in this direction is to establish that liability of the testator to be easily affected by fraud or undue influence, which constitutes the necessary counterpart of the other facts to be proved ": Sheiler v. Bumstead, 99 Mass. 120.

Charge of Court below.

You will now understand why it is that so much evidence has been introduced as to the state of Mr. Herster's mind, for it must be remembered that the issue now being tried is not whether the testator possessed a sufficient memory and understanding to make a will. Not at all. The plaintiffs concede that he had a sound and disposing mind when the three papers in controversy were executed, but their allegation is that his mind was so weakened by disease and old age as to make him an easy prey to the alleged machinations of his son Jackson and Jackson's wife. But even if you should be satisfied from the weight of the evidence that this was the condition of the testator's mind, that, as has been seen, would not be enough to warrant a verdict in favor of the plaintiffs. The duty would still rest on the plaintiffs to show that the weakness, such as it was, had been unduly influenced, and the will and codicils in controversy were the result of the undue influence thus exercised.

It is not pretended that any direct influence was brought to bear upon the testator in the very act of executing the will and codicils. The undisputed evidence is that the testator was alone with his counsel when he gave instructions for the preparation of the papers. The undisputed evidence also is that he came alone to the office of Mr. Lynn on three several occasions, when the will and codicils were signed, and that he there signed the papers in the presence of respectable witnesses, who are in no way implicated in the charge of undue influence here now made. To all outward appearance, therefore, the signing of the will and codicils was the free and voluntary act of the testator. Plaintiffs complain, however, that appearances in this case are deceitful, as they often are. Their allegation is that when these papers were executed the testator's mind was not free, but that it was fettered and controlled by cruel and unjust prejudice engendered against his other children by Jackson Herster and his wife through misrepresentation derogatory to the character and conduct of these other children.

If there is sufficient evidence in this cause tending legitimately to establish the truth of this serious charge, it will be my clear duty to submit it to your consideration. If, however, there is no such evidence it will be just as clearly my duty to

take such evidence as there is away from you and to direct a verdict in favor of the defendants. In Wilson v. Mitchell, 101 Penn. St. 505, the Supreme Court say that " a case should not be submitted to the jury where the evidence is so insufficient that the court ought not sustain the verdict." And in Cauffman v. Long, 82 Penn. St. 72, it is held to be the duty of the court to determine the sufficiency of evidence of testamentary capacity, and the same is true of undue influence, and that it is error to submit the question to the jury unless it be sufficient. On the contrary it is equally error to withdraw from the jury evidence that is sufficient, so that the judge who presides at the trial of issues like the present is between two fires, and no judge who has once, in an important case like the present, occupied such a position, is likely to be at all anxious to repeat the experience. But unpleasant and sometimes difficult as is the duty thus imposed, it must be met.

[Is, then, the evidence relied upon by the plaintiffs to establish undue influence sufficient for that purpose? It must be borne in mind that undue influence will not be presumed. True, it is not necessary to produce direct evidence of the fact, but where it is sought to be established by inference from other facts in the cause, the inference must be a necessary one. When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to be established by proof: Smith v. Bank, 99 Mass. 611. Moreover, " the influence to render a will void must be intentionally exercised specifically to procure the testament in question: Thompson v. Kyner, 65 Penn. St. 375. I fail to discover in the present case even the slightest evidence of the character just indicated.] [1]

Standing alone, the inequalities in the will and codicils create no presumption against the validity of the will and codicils, nor does the fact that Jackson had gained upon the affections of his father and in this way acquired an ascendency over him militate in any degree against the validity of the will and codicils.

The testator had a right to do as he pleased with his property, and Jackson had a right to use lawful persuasion and even importunity to induce his father to make a will in his favor, to the exclusion of his brothers and sisters. This is

familiar law calling for no citation of authorities. Nor does the fact that the testator's mind has been weakened by disease and old age alter the case in the least. But it is said that Jackson and his wife prejudiced the testator by false statements against the other children. Concede this for the sake of the argument, and yet it amounts to nothing, because there is no evidence that these statements were made to influence the testator in the testamentary act.

[It is quite likely that they were made, if made at all, from feelings of jealousy, or for the purpose of paving the way for the large benefaction Jackson received from his father in his lifetime.] [4]

There is no evidence that either Jackson or his wife at any time had any conversation with the testator about making his will.

[The statements, therefore, not being connected with the act of making the will and codicils, are not evidence to impeach them : Wainwright's Appeal, 89 Penn. St. 220. Thus far, therefore, we have discovered no evidence whatever of undue influence, and yet there is no other evidence on the subject. The declarations of the testator that Jackson and his wife had told him stories about his other children calculated to prejudice the testator against them are not evidence on the question of undue influence at all ; for there is no evidence that the declarations are true.] [2]

For all that appears they may have been the expressions of a mere delusion on the part of the testator. [Finding, therefore, no evidence whatever of undue influence in procuring the will and codicils in controversy, or either of them, it becomes my duty to direct you to return a verdict in favor of the defendants.] [3]

The jury returned a verdict for the defendants, whereupon the plaintiffs took this writ, assigning that the court erred :

1-4. In the parts of the charge embraced in [ ] [1] [2] [3] [4]

6. In sustaining the objection to plaintiffs' offer.[6]

8-10. In sustaining the objections to plaintiffs' offers.[8—10]

18. In directing a verdict in favor of the defendants.

*Mr. W. S. Kirkpatrick* and *Mr. Edward J. Fox* (with them *Mr. Frank Reeder* and *Mr. B. F. Fackenthall*), for the plaintiffs in error :

1. The act of a man who makes a gift or will must be that of one in the possession of his faculties. In the act he must be free from delusion as to the nature of the act he is about to perform. He must not be the victim either of deceit or constraint, and his act must be in accordance with his wishes, uncontrolled by imposition or unfairness : Wilson's App., 99 Penn. St. 551; Boyd v. Boyd, 66 Penn. St. 293; 1 Redf. Wills 534; 1 Wms. Ex. 41; Lord Donegal's Case, 2 Ves. Sr. 408; Hacker v. Newborn, Styles 427; Mountain v. Bennet, 1 Cox 355; Rambler v. Tryon, 7 S. & R. 93; Bisp. Eq. §§ 230–235 ; Smith v. Kay, 7 H. L. Cas. 750; Huguenin v. Baseley, 14 Ves. 273.

2. Where a feeble old man is the subject of undue influence, a case would indeed be rare where it would be possible to prove the statements made by the guilty parties and the artifices employed to entrap him. Crime almost invariably hides itself, and crimes of this nature are usually only to be detected by circumstantial evidence. Where the person is an inmate of the family of those who unduly influence him, while the effect of that undue influence might be clearly seen, it would be most difficult, we might almost say it would be impossible, to obtain direct proof of the exercise of artifice and fraud in procuring a will to be made. We know that fraud cannot be presumed, but must be proved. But that proof may be gathered from an infinite variety of circumstances, and a wide door is opened for the admission of all evidence which throws any light upon the transaction ; and no matter how trivial and unimportant a fact may be standing alone, it is not to be rejected, if it form but the smallest link in the chain of circumstances by which the fraud is to be established : Delafield v. Parrish, 25 N. Y. 95; Tyler v. Gardener, 35 N. Y. 593 ; Roberts v. Trawick, 17 Ala. 57.

3. Though there is a conflict of authority as to the admissibility of the declarations of a testator upon the question of undue influence, yet the weight of authority is very decidedly in favor of their admission : Reel v. Reel, 1 Hawks 268 ; Howell v. Borden, 3 Dev. 442 ; Roberts v. Trawick, 17 Ala. 57 ; Bates v. Bates, 27 Iowa 113; Stephenson v. Stephenson, 62 Idem 163 ; Rambler v. Tryon, 7 S. & R. 93 ; McTaggart v. Thompson, 14 Penn. St. 153 ; Norris v. Sheppard, 20 Penn. St.

478; Dennis v. Weeks, 51 Ga. 24; Lewis v. Mason, 109 Mass. 169; Sheiler v. Bumstead, 99 Mass. 112; Turner v. Cheeseman, 15 N. J. Eq. 243.

4. Though the court below charged that there was no evidence of undue influence, there was much evidence which should have been submitted, here summarized as suggested in Morgan's App., 19 W. N. 19. Besides, the will and codicils themselves were submissible evidence of the strongest character: Patterson v. Patterson, 6 S. & R. 56; 1 Redf. Wills 515; Baker v. Lewis, 4 R. 356.

*Mr. Wm. Mutchler* and *Mr. Henry W. Scott,* for the defendants in error:

1. Undue influence is the same as fraud, and the measure of proof to submit it to a jury must rise to the standard required to move a chancellor to decree the cancellation of a deed on that ground, viz.: " clear, precise and indubitable," and " not only consistent with the hypothesis of the will having been obtained by undue influence, but inconsistent with a contrary hypothesis ": Wms. on Exrs., 70* – 72*; Thompson v. Kyner, 65 Penn. St. 375; Smith v. Bank, 99 Mass. 611.

2. Declarations purporting to have been made by Andrew Jackson Herster after the execution of the will and codicils, were inadmissible because he was not the sole legatee or devisee, and all the others were not upon the record: Clark v. Morrison, 25 Penn. St. 453; Daniel v. Daniel, 39 Penn. St. 211; Boyd v. Eby, 8 W. 66.

3. Declarations of testator are not evidence sufficient to submit on the question of undue influence, especially when not so connected in point of time with the testamentary acts as to be part of the *res gestæ,* and as tending to a parol revocation void under the Wills act of April 8, 1833, P. L. 249: Hoshauer v. Hoshauer, 26 Penn. St. 404; Moritz v. Brough, 16 S. & R. 403; Clark v. Morrison, 25 Penn. St. 453; McTaggart v. Thompson, 14 Penn. St. 153; Redf. Wills 547*; Comstock v. Hadlyme, 8 Conn. 254; Kinne v. Kinne, 9 Conn. 102; Provis v. Reed, 5 Bing. 435; Clingan v. Mitcheltree, 31 Penn. St. 25; McMahon v. Ryan, 20 Penn. St. 331; Wainwright's App., 89 Penn. St. 220; Irish v. Smith, 8 S. & R. 573.

4. Unless the evidence is of a restraint over testamentary

acts, the court must give binding instructions: Eckert v. Flowry, 43 Penn. St. 52; Cauffman v. Long, 82 Penn. St. 72; Wilson v. Mitchell, 101 Penn. St. 495; Wainwright's App., 104 Penn. St. 220.

OPINION, MR. JUSTICE GREEN:

In this case an issue was granted to determine a question of undue influence exerted upon the mind of a testator in the execution of a testamentary writing. The issue was granted by the Orphans' Court, after a full hearing upon the matters of fact alleged against the will, and a contest upon the sufficiency of the facts in evidence to justify the granting of an issue. It must be assumed that in granting the issue the learned court was of opinion that there was evidence enough to carry the case to a jury, and to require a verdict to determine upon the disputed matter of fact in question. When the issue thus granted was tried in the Common Pleas the learned judge who tried the cause, who was not the same judge who granted the issue, was of opinion that there was not sufficient evidence to warrant a verdict against the will, and he withdrew the case from the jury by a binding instruction to return a verdict in favor of the will.

The question of undue influence exerted upon the execution of a will is a question of pure fact. Its disposition properly rests with the jury alone. Even if the trial judge should feel that were he sitting as a juror he could not regard the evidence as sufficient to induce him to find a verdict against the will, that is not enough to justify him in taking the case entirely from the jury. He must be prepared to go further than that, before he can deprive the jury of its proper control of the dispute. This court has indicated in a number of decisions a rule by which to determine the granting of an issue, and it is equally applicable in determining whether a cause of this kind ought to be withdrawn from the jury. It is thus expressed in a recent case: "If the testimony is such that after a fair and impartial trial resulting in a verdict against the proponents of the alleged will, the trial judge, after a careful review of all the testimony would feel constrained to set aside the verdict as contrary to the manifest weight of the evidence, it cannot be said that a dispute within

the meaning of the act has arisen. On the other hand, if the state of the evidence is such that the judge would not feel constrained to set aside the verdict, the dispute should be considered substantial and an issue to determine it should be directed. This simple and only safe test is supported alike by reason and authority:" Knauss and Seip's App., 114 Penn. St. 10. Having this principle in mind we have given to the testimony on this record a most patient and careful examination and study, and, after doing so we do not feel able to say that, had we been sitting as trial judges and a verdict been rendered against the will and codicils in question, we should have felt constrained to set aside the verdict. That being so, it is necessary to reverse the judgment of the court below in order that the cause may be heard and decided by a jury on its merits.

It would not be proper to discuss the testimony in detail, as we could not do so without giving a possible bias to the jury, and they ought to be entirely free to consider and determine the facts upon their own judgment. It is perhaps well to say that undue influence may be exercised secretly as well as openly, and this is especially possible where a confidential relation exists between the principal devisee and the testator and they dwell together in the same house. In such cases it is not easy to make out an allegation of undue influence by proof which is direct or positive, nor is it necessary to do so. The effects of its exertion may be very visible, but as these may also be consistent with a perfectly free will, much caution must be exercised by the jury in considering such an aspect of the case. Rash conclusions must not be drawn simply because of a large disproportion of the estate being given to one to the exclusion of others; and the evidence of the exertion of undue influence must be of a satisfactory and convincing character, whether it be direct or circumstantial. With these reflections we dismiss this part of the case, and sustain the first, second, third, fourth and eighteenth assignments of error.

We sustain the sixth assignment because the question asked had some tendency to show the relations between the testator and his son, the principal devisee, and might possibly tend to illustrate the power of the son over the father. We sustain

Syllabus.

the eighth, ninth and tenth assignments, because we cannot say that the answers to the proposed questions would not indicate the exertion of undue influence or of improper control of the free agency of the testator, both as to the making of the will and its custody, and, indeed, as to his assent to its contents. As to the remaining assignments we think they are without merit and they are not sustained.

Judgment reversed and new venire awarded.